

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHEATESTERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DORIS NICHOLS,                          )
                                        )
          **Plaintiff,**              )
                                        )
             **v.**                          )
                                        )
MICHAEL J. ASTRUE[1]                    )
**Commissioner of Social Security,**    )
                                        )
          **Defendant.**             )
                                        )

**No. 02 C 7099**

**Magistrate Judge Maria Valdez**

## MEMORANDUM OPINION AND ORDER

This is an action brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security ("Commissioner") denying Doris Nichols' claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons explained below, the Court grants in part Plaintiff's Motion for Summary Judgment or Remand [Doc. No. 24], denies the Commissioner's Motion for Summary Judgment [Doc. No. 25], and finds that this matter should be remanded for further proceedings.

### I.    PROCEDURAL HISTORY

On April 29, 1998, Nichols applied for DIB, alleging that she was incapable of work due to pain in her right knee, claiming an onset date of June 11, 1996. (R. 67-69, 74.) On September 4, 1998, the Social Security Administration ("SSA") found that

---

[1] Michael J. Astrue is substituted for his predecessor pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

Nichols suffered from osteoarthritis in her right knee and obesity but denied her application. (R. 48.) Nichols filed a timely request for reconsideration, which was denied on February 11, 1999. (R. 52-53.) Nichols then filed a request for a hearing by an Administrative Law Judge ("ALJ") on March 2, 1999, which was granted, and the hearing commenced on June 3, 1999. (R. 58, 61.) The ALJ ruled that under the Social Security Act, Nichols had not been disabled at any time through the date of the hearing because she could still perform limited light work, and there were a significant number of jobs in the national economy which she could perform. (R. 25.) Nichols filed a request for a review of the ALJ's ruling on October 6, 1999, which was rejected by the SSA Appeals Council on April 12, 2002. (R. 11-12.) Therefore, the ruling of the ALJ is a final decision of the Commissioner, and there is a right to review by this District Court provided by 42 U.S.C. § 405(g).

## II. FACTUAL BACKGROUND

### A. Background

At the time of the hearing, Nichols was fifty years old, five feet five and three quarters inches tall, and weighed approximately 220 pounds, although she has weighed up to 260 pounds. (R. 30, 33.) She completed high school, attended college for one year, and underwent vocational training to become a medical assistant. (R. 34, 78.)

Nichols was employed as a medical assistant to a private doctor from 1987 to 1991 and was most recently employed by Humana HMO from 1991 to 1996. (R. 37-38.) She claims to have stopped working because of pain in her leg, caused by arthritis after a car accident. (*Id.*)

2

## B.   Medical Evidence and Testimony

### 1.   *Medical Evidence*

Prior to Nichols' car accident, which was the onset of the alleged disability, she was treated by Dr. Asche for diabetes, hypercholesterolemia, and obesity. (R. 147.) He prescribed her insulin and advised her to lose weight  (R. 144, 147.)

On June 13, 1996, Nichols injured her right knee when it hit the dashboard in a car accident, which she claims caused the disability for which she seeks benefits. (R. 142.) She was sent to an emergency room, where it was noted that there was swelling and tenderness over the patella of her right knee and minimal crepitus. (*Id.*) The x-rays on her knee came out negative, there was no evidence of a fracture, and she had a good range of motion. (*Id.*) She visited Dr. Asche on June 20, 1996 due to her knee pain, seeking an adjustment in her return-to-work status. (R. 143.) Dr. Asche noted that she had severe right knee pain and needed an adjustment in her work status but also noted her return-to-work date could only be determined by a treating orthopedist. (*Id.*)

Subsequently, Nichols was examined by an orthopedist, Dr. Alaswad, on June 26, 1996. (R. 142.) He found minimal crepitus with swelling and tenderness over the patella of her right leg and soft tissue injury, for which he advised her to "restrict her activities and be off work." (*Id.*) On July 3, Nichols again visited Dr. Alaswad complaining of right knee pain, which gave him the impression that she had a partial tear of the quads tendon. (R. 140.) He performed an MRI on July 25, finding a small joint effusion with a small Baker's cyst, degenerative changes with osteophytes about the knee, chondromalacia patella with probable osteochondral defect with subchondral cyst formation, and tear of the posterior horn of the medial meniscus. (R. 178-79.) On

3

August 7, Dr. Alaswad found the quads tendon to be intact, but he also believed the injury could have aggravated the patellofemoral arthritis that she was currently suffering from. (R. 139.) He prescribed anti-inflammatory medications, steroid injections, and physical therapy, and indicated that she should be able to return to regular activities in four weeks. (*Id.*) Nichols visited with Dr. Alaswad again on September 4, 1996, when he opined that he was "quite suspicious" of damage to the quads tendon, despite the MRI being normal in this area. (R. 137.) He recommended a debridement and an arthroscopy due to her residual pain, as well as an exploration of the quads tendon, due to her obesity and diabetes. (*Id.*)

On October 23, 1996, Dr. McClellan performed a right knee arthroscopy, arthroscopic patellar shaving, debridement, and a partial medial meniscectomy. (R. 133, 136.) Dr. McClellan reported that Nichols had post-traumatic chrondromalacia of the medial femoral condyle and patellofemoral joint. (R. 133.) Nichols returned for an examination by Dr. McClellan on December 5, 1996, at which time she was using a crutch and complained of knee pain that worsened with prolonged standing and walking. (R. 131.) He noted that her injury was healing satisfactorily, except for the pain she still experienced. (*Id.*) On January 2, 1997, Nichols informed Dr. McClellan that she had less pain and was more functional. (R. 129.) McClellan found that she had no effusion, no tenderness, and no instability, and stated that "[o]verall, she is doing well." (*Id.*) He also noted that "we will allow her to return to work." (*Id.*)

Nichols had follow-up appointments with Dr. McClellan on February 5 and March 6, 1997, in which she complained of right knee pain when walking. (R. 127-28.) At the second appointment, he "felt there is some residual osteoarthritis." (R. 127.)

McClellan administered a steroid injection on March 6 and a second on April 10, and prescribed Darvocet for particularly bad episodes of pain. (R. 124, 127.) An x-ray on April 10 showed decreased medial joint line of the right knee, which McClellan believed was secondary to post-traumatic osteoarthritis. (R. 124.) Dr. McClellan reported on May 22, 1997, that Nichols' knee was improving, although she might have occasional knee pain. (R. 123.) Nichols next visited Dr. McClellan on August 27, 1997, at which time he found that the Darvocet was no longer effective in treating the pain, and he decided to instead prescribe Indocin and acetaminophen. (R. 121.) Nichols saw Dr. McClellan again on February 11 and April 10, 1998, and in both instances she continued to complain of right leg pain and swelling. (R. 119, 192.) Dr. McClellan ruled out pes anserine bursitis, and began to treat her with Zostrix and Ultram. (R. 119.) Nichols underwent an MRI on June 17, 1998, and the report showed a prominent intermediate signal abnormality of the medial meniscus midzone, attenuated medial meniscus posterior horn, and osteoarthritic changes for which she should be treated symptomatically with Salsalate and Ultram. (R. 185, 187-88.) On July 3, 1998, Dr. McClellan noted that the scans showed osteoarthritic changes which were not expected and partial medial meniscectomy changes which were expected. (R. 186.)

At the request of the state disability examiners, Eric Schoenfeld, Ph. D., completed a psychiatric report of Nichols on November 12, 1998. (R. 194-96.) Dr. Schoenfeld noted that he had seen Nichols once a month since October 27, 1997. (*Id.*) He found that Nichols' physical limitations caused her stress and depression. (R. 195.) He also noted that she was relevant and coherent and she had no hallucinations, delusions, or any suicidal or homicidal ideations. (R. 195.) Dr. Schoenfeld concluded

that Nichols was unable to work due to physical disability and chronic pain. (R. 196.) On November 19, 1998, Dr. Sing, a non-examining state agency psychiatrist, reviewed Dr. Schoenfeld's report to determine whether Nichols was eligible for disability under the SSA. (R. 197-99.) He completed a mental Residual Functional Capacity ("RFC") assessment, in which he indicated she was moderately limited in her ability to understand, remember, and carry out detailed instructions. (R. 197.) He also indicated she was moderately limited in her ability to complete a workweek without interruptions from psychologically based symptoms and in her ability to work without rest periods of an unreasonable length. (R. 198.) He stated that she may be restricted in carrying out complex jobs, but she did have "the mental capacity to perform simple, unskilled jobs within the limits of her physical condition." (R. 199.) On November 25, 1998, Dr. England completed a RFC assessment on her physical abilities, in which he limited Nichols' RFC to light work that only required occasional kneeling, stooping, or crouching. (R. 208-15.)

Nichols saw Dr. Miller on an emergency basis due to the pain in her right knee on May 4, 1999. (R. 226.) Dr. Miller reported that Nichols was in tears due to the pain, and he found that she had marked tenderness over the anserine bursa of the right knee with palpable osteophytes. (*Id.*) Standing x-rays showed an approximate fifty-percent loss of normal cartilage space in the medial compartment of her knee. (*Id.*) Dr. Miller administered a steroid shot, which promptly helped reduce the pain. (R. 227.) He administered another steroid injection on May 27, 1999, and reported that Nichols had osteoarthritis and tendonitis, but the osteoarthritis was "not severe enough for a knee replacement as yet." (*Id.*) On May 6, 1999, her former treating orthopedist, Dr.

McClellan, completed an Attending Physician's Statement for the SSA's evaluation of Nichols' claim. (R. 225.) Dr. McClellan found Nichols could not perform the work for which her skills or special training would qualify her and she could not perform her regular job, but he did not indicate that she "cannot do any work, including light sedentary work." (*Id.*)

## 2. *Plaintiff's Testimony*

Nichols testified that she had been seeing doctors for her right knee pain since June 13, 1996. (R. 32.) At the time of the trial, she was on Bercotram for pain in her knee, insulin (treatment for her diabetes), a pressure pill, and hydrochlorothiazide (a water pill). (R. 34.)

Nichols stated that due to her knee pain, it was difficult to wash and dress herself and that sometimes she needed help in doing so. (*Id.*) She stated that she did very little cooking, running of the vacuum, washing of the clothes, making of the bed, and washing of the dishes, and that usually her husband and sons performed these household chores. (*Id.*) She also stated that she watched two hours of T.V. a day on average, and often read her Bible as she elevated her leg in bed. (R. 35.) She testified that she only left the house to see her doctor or go to church, and that occasionally she goes to the grocery store with her husband, although she does not carry the grocery bags. (R. 36.)

Nichols testified that she had worked as a medical assistant for a private doctor from 1987 to 1991 and as a doctor's assistant for Humana HMO from 1991 to 1996. (R. 35-36.) She stated that her work duties included helping patients onto the exam table and helping them get dressed. (R. 38.) She also performed blood tests and used medical equipment, such as an EKG machine, a centrifuge, and a hearing machine. (R. 40.)

### 3. *Plaintiff's Husband's Testimony*

Nichols' husband testified that after the accident on June 13, 1996, his wife did very little housework. (R. 42.) He also testified that she no longer walked with him to a park as they had prior to the accident since she "can't even walk." (R. 43.) Mr. Nichols stated that, while at home, she lay in bed most of the time. (*Id.*)

### C. ALJ Decision

The ALJ held that Nichols had not been engaged in gainful activity since June 12, 1996. (R. 24.) He found the medical evidence established that Nichols has severe osteoarthritis of the right knee, hypertension, and diabetes. (*Id.*) The ALJ concluded that the hypertension and diabetes alone or coupled with one another did not constitute severe impairments, but in combination with her osteoarthritis should be considered severe under 20 C.F.R. § 404.1521. (R. 23-24.) However, the ALJ did not find that these impairments were listed or medically equal to the criteria of 20 C.F.R. Pt. 404 Subpt. P., App. 1, and therefore, the claimant was not disabled *per se* under Step 3 of the five-step disability analysis. (R. 24.) The ALJ found that Nichols could not lift in excess of twenty pounds occasionally or ten pounds frequently and she could not kneel, stoop, or crouch more than occasionally. (*Id.*) The ALJ stated that he did not believe Nichols could perform her former work as a doctor's or patient's assistant, which required her to lift patients in excess of her lifting limitations. (*Id.*)

The ALJ concluded, however, that Nichols would be able to perform jobs that exist in significant number in the national economy, and thus she was not disabled under Step 5 of the analysis. (R. 25.) The ALJ listed the position of a medical records clerk as an example of such a job, which he found Nichols could perform due to her transferable

8

skills as a doctor's assistant and patient aide. (*Id.*) The ALJ also found that Nichols did not have any acquired work skills which are transferable to the skilled or semiskilled work activities of other work. (*Id.*)

Additionally, the ALJ supported his finding that she was not disabled under Step 5 by use of the "grid" located in 20 C.F.R. Pt. 404, Subpt. P., App. 2, Table No. 1 and 2. (R. 25.) The ALJ found that if Nichols either had the capacity to perform the full range of light work or were limited to no more than the full range of sedentary work, the grids directed the conclusion that she is not disabled. (*Id.*)

In reviewing her capacity to work, the ALJ stated that Nichols' RFC would be limited from the full range of light work by only being able to occasionally kneel, crouch, and stoop. (*Id.*) He did not find that she had any nonexertional limitations, such as any based on a mental RFC under 20 C.F.R. § 404.1545. (R. 24.) The ALJ noted that Dr. Schoenfeld's psychiatric report stated Nichols had a depressed mood secondary to pain. (R. 23.) The ALJ concluded her depression did not indicate any severe mental impairment, since the report stated she was relevant, coherent, reported no hallucinations, delusions, suicidal ideations, disorientation, significantly decreased fund of knowledge or memory or other significant cognitive/behavioral manifestations. (*Id.*)

The ALJ also found that Nichols' daily activities had not been greatly limited. (R. 24.) He based this conclusion on Nichols' testimony, which the ALJ summarized by stating she "generally gets up at about 9:00 a.m., cooks, makes the bed, vacuums, washes clothes and dishes, reads the Bible and watches about two hours of television a day," and that she "leaves her home daily to go shopping, to attend doctor's appointments, and to attend church twice a week." (R. 22.) The ALJ found Nichols' testimony credible, and

based on her ability to perform such activities, he found she must be able to perform light work. (R. 24.) Based on the lack of a finding of disability under Step 3 or Step 5, the ALJ concluded Nichols was not under a "disability" as defined in the Social Security Act. (R. 25.)

## III. DISCUSSION

### A. The ALJ's Legal Standard

Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). The ALJ determines whether a claimant is disabled by considering the following five questions in order, as outlined in 20 C.F.R. § 416.920(a)-(f): 1. Is the claimant presently unemployed? 2. Does the claimant have a severe impairment? 3. Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? 4. Is the claimant unable to perform his former occupation? 5. Is the claimant unable to perform any other work?

A negative answer at any step, other than at step 3, precludes a finding of disability. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Id.* The claimant bears the burden of proof at steps 1-4. *Id.* Once the claimant shows an inability to perform past work, he has established a *prima facie* case of disability, and the burden shifts to the Commissioner to show the ability to engage in other work existing in significant numbers in the national economy. *Id.*

## B. Judicial Review

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Erhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992). This court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998).

The ALJ is required to "build an accurate and logical bridge from the evidence to [his] conclusion" in cases in which he denies benefits. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This does not mean that the ALJ must address "every piece of evidence or testimony in the record." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). However, the ALJ may not "select and discuss only the evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

## C. Analysis

The ALJ's conclusion that Nichols was not disabled was based on his finding that she could perform limited light work for which there are a significant number of jobs in the national economy. (R. 25.) Nichols seeks a reversal of the ALJ's decision, or in the alternative, a remand for further proceedings. She challenges the ALJ's decision for the following reasons: (1) he improperly found she had transferable skills; (2) he misstated

11

her testimony regarding her daily activities; (3) he failed to consider the opinion of her primary physician; (4) he did not take Nichols' obesity into account when evaluating her osteoarthritis; and (5) his decision disregarded her mental impairments.

## 1.    *Transferable Skills*

Nichols first challenges the ALJ's finding of transferable skills. If an ALJ finds a claimant has transferable skills, the acquired skills must be identified, and specific occupations to which those skills transfer must be stated in the ALJ's decision. SSR 82-41;[2] *Key v. Sullivan*, 925 F.2d 1056, 1062 (7th Cir. 1991). The ALJ found Nichols had transferable skills that would allow her to work as a medical records clerk ("MRC"). Although the ALJ listed a specific occupation to which her skills transfer, he did not identify the transferable skills which would allow Nichols to work as a MRC. The ALJ found it was "obvious" Nichols had acquired skills as a doctor's assistant that would be transferable to a MRC position because she had "experience in a medical office." (R. 24.) However, Nichols' work as a doctor's assistant consisted of helping patients onto exam tables and undressing, performing blood tests, and using medical equipment. (R. 38, 40.) According to the Department of Labor's *Dictionary of Occupational Titles*, a MRC is required to compile, verify, type, and file medical records, as well as other office tasks. *Dictionary of Occupational Titles*, 213 (4th ed. 1991). Thus, it is not "obvious" that the skills acquired by Nichols as a doctor's assistant are transferable to a MRC position. The ALJ's conclusion, therefore, is not supported by substantial evidence from the ALJ's findings or in the record. Moreover, even if the skills of a doctor's assistant

---

[2] Interpretive rules, such as Social Security Regulations ("SSR"), do not have force of law but are binding on all components of the Agency. 20 C.F.R. § 402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

did clearly transfer to that of a MRC, the ALJ failed to follow the requirements of SSR 82-41 by not identifying the transferable skills in his findings.

SSR 82-41 also requires the ALJ to include evidence indicating the existence of a significant number of jobs in the national economy for which the claimant has the necessary transferable skills. This evidence may be "VS [vocational specialist] statements based on expert personal knowledge or substantiation by information contained in the publications listed in regulations sections 404.1566(d) and 416.966(d)." SSR 82-41. The ALJ did state that there are a significant number of skilled jobs that Nichols could perform based on Grid Rule 201.15, but he did not include any evidence from a VS or from the publications listed in SSR 82-41 which indicated the existence of such jobs.[3]

The Commissioner responds that the ALJ's finding of no disability should be upheld despite the error in finding transferable skills because Nichols can perform unskilled work based on the Medical Vocation Guidelines (the "grids"). The grids direct a finding of disabled or not disabled based on the claimant's RFC, age, education, and previous work experience. A finding of "no disability" in the grid rules indicates that there are a significant number of jobs in the national economy that the claimant can perform. 20 C.F.R. Pt. 404 Subpt. P., App. 2 § 200.00(b). The ALJ used Grid Rules 202.15 and 201.15 to find that Nichols was not disabled. These rules apply to a claimant who is closely approaching advanced age, has a high school education, and has

---

[3] Nichols also points out that the ALJ's finding regarding transferable skills is internally contradictory. The ALJ stated under Finding 10 that Nichols did not have any acquired work skills which are transferable to the skilled or semiskilled work activities of other work. (R. 25.) In Finding 12, the ALJ then stated that a MRC is a position Nichols could perform due to her transferable skills as a doctor's assistant and patient aide. (*Id.*)

transferable skills. 20 C.F.R. Pt. 404 Subpt. P., App. 2, Table 1 and 2. Rule 202.15 directs a finding of not disabled for a claimant whose RFC allows for light work, and Rule 201.15 directs a finding of not disabled for a claimant whose RFC allows for sedentary work. Therefore, contrary to the Commissioner's argument, the ALJ determined that Nichols was not disabled pursuant to the grids based on his finding of transferable skills, not on Nichols' ability to perform unskilled work.

The Commissioner admits that the ALJ used the wrong grid rule. The Commissioner maintains, however, that had the ALJ correctly used Grid Rule 202.14, that rule would have also directed a finding of "not disabled." If an ALJ finds a claimant is not disabled, his application of the wrong grid rule is harmless error if the proper rule also directs a finding of "not disabled." *Cannon v. Harris*, 651 F.2d 513, 518 (7th Cir. 1981).

The Court therefore must determine: (1) whether the ALJ should have relied on Grid Rule 202.14, which applies to a claimant who is found to have an RFC to perform a full range of light work and has no transferable skills; and (2) whether Nichols would be found disabled or not disabled under that grid rule. If a claimant has non-exertional limitations that restrict the full range of employment opportunities at the level of work that he is capable of performing, use of the grids is usually precluded.[4] However, an ALJ may rely on the grids if he finds substantial evidence that the non-exertional limitations in

---

[4] "Where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled. However, each of these findings of fact is subject to rebuttal and the individual may present evidence to refute such findings. Where any one of the findings of fact does not coincide with the corresponding criterion of a rule, the rule does not apply in that particular case and, accordingly, does not direct a conclusion of disabled or not disabled." 20 C.F.R. Pt. 404 Subpt. P., App. 2. § 200.00.

14

question do not significantly diminish the claimant's ability to work. *Walker v. Bowen*, 834 F.2d 635 (7th Cir. 1987). The ALJ found Nichols' ability to perform light work was limited by only being able to occasionally kneel, crouch, and stoop. (R. 25.) These are all considered to be bending restrictions, which are non-exertional limitations. SSR 85-15(2.). According to SSR 85-15, if the claimant only has the ability to occasionally stoop and crouch, "the sedentary and light occupational [job] base is virtually intact." Also, the limited ability to kneel "would be of little significance in the broad world of work." SSR 85-15(2). Under this analysis, Nichols would be found not disabled under Grid Rule 202.14.

However, as will be discussed more fully in Part C.5 below, the ALJ also made a finding suggesting that Nichols may have a nonexertional mental impairment: "The use of the grid rules in determining whether a claimant can perform light work is inappropriate where the claimant's nonexertional impairments are so severe as to limit the range of work he can perform." *Hampton v. Massanari*, 171 F. Supp. 2d 791, 797 (N.D. Ill. 2001) (citing *Herron v. Shalala*, 19 F.3d 329, 336 (7th Cir. 1994)). If a claimant's mental impairments do limit the range of work she can perform, the ALJ should obtain the testimony of a vocational expert in order to make the disability determination. *Id.* at 797-98 & n.2 ("Exertional limitations affect the ability to meet the strength demands of jobs, such as sitting, standing, and walking. . . . Nonexertional limitations relate to the ability to meet other demands of a job, including: postural limitations, limitations resulting from an inability to concentrate, and limitations from difficulty understanding or remembering.") (citing 20 C.F.R. §§ 404.1569a(b)-(c)(1)). The Court makes no finding as to whether the record demonstrates that Nichols has a

nonexertional mental impairment limiting the work she could perform. But if the ALJ did so find, he should have obtained the testimony of a vocational expert rather than solely rely upon the grids to determine whether she was disabled. It is not clear from the ALJ's opinion whether he considered any nonexertional mental impairments or the effect of any such impairments on his use of the grid rules.

## 2. *Daily Activities*

Nichols claims that the ALJ misstated her testimony when he concluded that Nichols could perform light work, despite expressly finding that her testimony was credible. When asked whether she cooked, made the bed, vacuumed and washed clothes and dishes, Nichols responded that she either did so "very little" or "sometimes," but the ALJ concluded based on her testimony that Nichols "generally" performed these household chores. (R. 22, 34.) The ALJ further found that Nichols "left her home daily to go shopping," even though Nichols testified only that she went grocery shopping "once in a while." (R. 22, 36.) The ALJ also concluded that Nichols attended church twice a week, but Nichols stated she "tried to go to church on Sunday, sometimes Bible class." (R. 36.) Other testimony suggests that Nichols lay in bed most of the day and that she was in pain when performing chores. (R. 34-35.) The ALJ thus overstated the frequency and extent of Nichols' daily activities, even after having found that her testimony as to those issues was credible.

A misstatement of fact by the ALJ is not automatic grounds for remand unless the misstatement affects the outcome of the decision. *See Benedict v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 29 F.3d 1140, 1144 (7th Cir. 1994). Nichols contends that the ALJ's erroneous assumptions about her daily activities led him

to improperly conclude she had the ability to perform light work. Minimal daily activities, such as vacuuming and cooking simple meals, do not establish that a person is capable of performing substantial physical activity. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Moreover, even if a claimant can perform certain physical activities that may in themselves be considered light work, the courts have distinguished the ability to occasionally perform such activities from being able to continually perform them on a full-time work schedule. *See Carradine v. Barnhart*, 360 F.3d 751, 755-56 (7th Cir. 2004).

The Commissioner responds that Nichols' activities were only one of several factors the ALJ considered in evaluating her application for disability, citing *Johansen v. Barnhart*, 314 F.3d 283 (7th Cir. 2002). In *Johansen*, however, the ALJ had adequately explained that the claimant's allegation that he could not perform light work was inconsistent with the record as a whole. *Id.* at 288. In this case, the ALJ did not make such a determination, and the record, including Dr. McClellan's report, Nichols' testimony, and the findings in Dr. Sing's mental RFC of Nichols, is not inconsistent with Nichols' allegation that she cannot perform light work. The Court makes no finding as to whether the record supports the ALJ's ultimate conclusion that Nichols can perform full-time light work, but because the ALJ did not build a logical bridge from his assessment of Nichols' and her husband's testimony of her daily activities to his conclusion, the case must be remanded for further explanation of this issue.

### 3. *Dr. McClellan's Opinion*

Nichols argues that the ALJ improperly disregarded Dr. McClellan's opinion that she could not perform light work. Dr. McClellan was Nichols' treating physician from

1996 to 1998, and in 1999 he was asked to complete an Attending Physician's Statement for the SSA's evaluation of Nichols' claim. In the physician's statement, Dr. McClellan indicated Nichols could not perform her previous job or work for which she was qualified. (R. 225.) The ALJ came to the opposite conclusion, and he failed to mention Dr. McClellan's statement in his decision. An ALJ need not provide a written evaluation of every piece of evidence that is presented. *Pugh v. Bowen*, 870 F.3d 1271, 1278 (7th Cir. 1984). Instead, the ALJ must consider and discuss "the important evidence," *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985), including "all evidence that is credible, supported by clinical findings and relevant to the question at hand." *Garfield v. Schweiker*, 732 F.2d 605, 610 (7th Cir. 1984). An ALJ may not ignore evidence that suggests an opposite conclusion. *Taylor v. Schweiker*, 739 F.2d 1240, 1243 (7th Cir. 1984); *see also Murphy v. Astrue*, ___ F.3d ___, 2007 WL 2012385, at *4 (7th Cir. July 13, 2007) (holding that because the ALJ "failed to explain his disregard of evidence suggesting disability[,] . . . a reasonable person could not accept his reasoning as adequate to support the decision").

Dr. McClellan's finding that Nichols cannot perform certain work is clearly relevant to the question of her disability, and thus the ALJ should have considered his report or at least explained why he chose to disregard it. Although Dr. McClellan's assessment is not entitled to controlling weight, the ALJ should have offered some explanation why he disregarded Dr. McClellan's statement and instead relied on the opinion of Dr. England, a non-treating physician. *See Clifford*, 227 F.3d at 870 (holding that an ALJ must adequately articulate his reason for disregarding a treating physician's medical opinion).

18

The Commissioner responds that Dr. McClellan's opinion should not be given any weight "to the extent [it] was based on his belief that Plaintiff could not perform any work for which her skills or special training would qualify her" because it was outside of his area of expertise. (Def.'s Mem. Support Summ. J. at 12, citing *Schmidt v. Apfel*, 201 F.3d 970 (7th Cir. 2000)). In *Schmidt*, the court upheld an ALJ's decision to exclude a VE's testimony "in which he overstepped his role," *i.e.*, by opining about the claimant's physical ability to continue work. *Id.* at 973. But nothing in the record shows that Dr. McClellan is not qualified to render an opinion as to the facts underlying the Attending Physician's Statement for the SSA's evaluation of Nichols' claim.[5] Accordingly, the ALJ should have explained why he either disregarded or discredited Dr. McClellan's opinion.

The Commissioner also points out that the determination of whether an individual is disabled is an issue reserved to the Commissioner. It is true that a claimant is not entitled to benefits simply because a physician finds that the claimant is "disabled" or "unable to work"; rather, the Commissioner is charged with determining the ultimate issue of disability. 20 C.F.R. § 404.1527(e). However, in deciding whether a claimant is disabled, a claimant's medical records are always to be taken into consideration. 20 C.F.R. § 1527(b). Any statement made by a medical source as to what a patient can still do is also to be considered. 20 C.F.R. § 404.1545(a)(3). Accordingly, while Dr. McClellan's opinion as to what work Nichols could perform is not conclusive, the ALJ

_____

[5] Notably, the Attending Physicians Statement given to Dr. McClellan by the SSA specifically asked whether Nichols could perform work for which her skills qualified her. Therefore, it appears somewhat disingenuous for the Commissioner to suggest that Dr. McClellan overstepped his role and/or rendered an opinion outside his expertise when the SSA itself asked him the question.

was required to take Dr. McClellan's opinion into consideration and/or explain why he did not appear to give the opinion any weight at all.

### 4. *Obesity*

Nichols contends that the ALJ erroneously failed to assess the effect of her obesity on her osteoarthritis. Obesity is considered by the SSA to be "a medically determinable impairment" whose effects adjudicators must consider when evaluating disability, including the severity of an individual's impairments. SSR 02-01p. An adjudicator must also consider the combined effect of all of the claimant's ailments (including obesity), regardless of whether "any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523; *see Green v. Apfel,* 204 F.3d 780, 782 (7th Cir. 2000). There are numerous references to Nichols' excessive weight problem in the record. Nichols was treated for obesity, was advised to lose weight, evaluations on her knee were based on her obesity, and the SSA in 1998 determined that Nichols suffered from obesity. (R. 48, 127, 144, 146, 226.) Nichols did not claim obesity as a disability when she filed her Disability Report; however, the references to her obesity in the record should have alerted the ALJ that her obesity was an impairment that could contribute to the cumulative effect of her other impairments. *See Fox v. Heckler,* 776 F.2d 738, 740-42 (7th Cir. 1985).

The Seventh Circuit has found that the ALJ may indirectly consider the effects of a claimant's obesity by adopting the limitations of reviewing doctors who incorporated the claimant's obesity in their findings. *See Skarbek v. Barnhart,* 390 F.3d 500, 504 (7th Cir. 2004). By adopting such limitations, an ALJ essentially factors the claimant's obesity into the outcome of the case, and thus his failure to explicitly mention the

claimant's obesity is harmless error. *Id.* The ALJ in this case did not make any specific mention of Nichols' obesity, although he did indirectly incorporate Nichols' obesity in his decision by adopting Dr. England's findings. In his RFC report, Dr. England stated Nichols could perform limited light work. The RFC report, however, was made prior to the x-rays that showed Nichols had a 50% loss of the cartilage space in her right knee. England's conclusion, therefore, did not incorporate the effects of obesity on the lost cartilage found in her x-ray. And although the ALJ also considered the conclusions of Dr. Miller, who reviewed the x-ray, knew of Nichols' obesity, and found that Nichols did not require a knee replacement, Dr. Miller never issued a report indicating whether there were any limitations on Nichols' ability to work. An ALJ is required to consider the claimant's medical condition as a whole. *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004). Without making any factual finding as to the effect of Nichols' obesity combined with the loss of cartilage space on her ability to work, the ALJ did not consider Nichols' condition as a whole. *See Murphy*, 2007 WL 2012385, at *3 ("An ALJ has a duty to fully develop the record before drawing any conclusions . . . .).

### 5. *Mental Impairments*

Nichols' final claim of error is that the ALJ disregarded her mental limitations. When a claimant raises the issue of her mental limitations, the ALJ must first evaluate the claimant's pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b). After finding an impairment, an examiner must then determine whether the mental impairment is "severe" and whether it reaches the level of a listed disorder. If the

21

disorder is severe, though not at the level of a listed impairment, the examiner must conduct a RFC assessment. 20 C.F.R. § 404.1520a(c)(2) & (3).

The ALJ's decision stated that Nichols does not have a "severe depressive disorder under Listing 12.04" but has "possible reactive depression" that is a "severe impairment."[6] (R. 23, 24.) Pursuant to 20 C.F.R. § 404.1520a, the ALJ was then required to conduct a mental RFC assessment. However, the ALJ neither mentioned the mental RFC that was performed by Dr. Sing nor completed a separate RFC assessment.

Nichols alleges that by disregarding the mental RFC, the ALJ favored his own psychological examination and impermissibly "played doctor." ALJs must not succumb to the temptation to make their own independent medical findings. *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990). "An ALJ may not ignore an entire line of evidence that is contrary to his findings," *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999), rather he must "articulate at some minimal level his analysis of the evidence" to permit an informed review. *Clifford*, 227 F.3d 863 at 872.

Dr. Sing's RFC concluded that Nichols could perform "simple, unskilled jobs" but may be constricted in carrying out "complex jobs," which does not satisfy the criteria of a severe impairment. However, Dr. Sing also concluded that Nichols may not be able to perform simple work without reasonable rest periods, which may satisfy the

---

[6] The ALJ's finding regarding a possible mental impairment was internally inconsistent. In the body of his opinion, the ALJ stated that Nichols suffered from depression secondary to pain, but that the psychiatric report's conclusion that she was not able to work was not an indication of a severe mental impairment and her activities were not greatly limited. (R. 23.) But in Paragraph 3 of his findings, the ALJ concluded that that "[t]he medical evidence establishes that the claimant has . . . possible reactive depression," which was one of several conditions he stated were "severe impairments." (R. 24.)

requirements of a severe impairment.[7] Instead of considering Dr. Sing's RFC, the ALJ included in his findings the psychiatric report by Dr. Schoenfeld, which noted that Nichols had a depressed mood, but that she is "relevant and coherent, reports no hallucinations, delusions...or other significant cognitive/behavioral manifestations." (R. 23.) The ALJ, however, did not articulate his analysis regarding Nichols' possible mental impairments, specifically why he did not consider Dr. Sing's report, which could support a finding of disability, while relying upon a contrary report.

## CONCLUSION

For the foregoing reasons, the Court grants in part Plaintiff's Motion for Summary Judgment or Remand [Doc. No. 24], denies the Commissioner's Motion for Summary Judgment [Doc. No. 25], and finds that this matter should be remanded for further proceedings.

**SO ORDERED.**

**ENTERED:**

Maria Valdez

DATE: **AUG 1 6 2007**

**HON. MARIA VALDEZ**
**United States Magistrate Judge**

---

[7] "Deficiencies that are apparent only in performing complex procedures or tasks would not satisfy the intent of this paragraph B criterion. However, if you can complete many simple tasks, we may nevertheless find that you have a marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions." 20 C.F.R. Pt. 404, Supt. P., App 1 §12.04(c)(3).